UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DIEGO BELONE,<br><br>Defendant. | 5:25-CR-50048-CCT<br><br>**ORDER ADOPTING IN PART AND DENYING IN PART REPORT AND RECOMMENDATION AND GRANTING DEFENDANT'S MOTION TO SUPPRESS** |

Defendant Diego Belone is charged with possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(8). Docket 1. He moves to suppress his statements made to law enforcement on January 3, 2025, including statements made during his interrogation at the police station. Docket 24. He also moves to suppress evidence obtained from the search of his vehicle and person. *Id.* The Court referred Belone's motion to a magistrate judge under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, the magistrate judge recommended that Belone's motion to suppress be granted in part and denied in part. Docket 40. Belone filed objections to the Report and Recommendation. Docket 48. The government responded to Belone's objections, Docket 53, and filed its own objection, Docket 50.

**LEGAL STANDARD**

This Court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Federal Rule of Criminal Procedure 59.

Because motions to suppress evidence are considered dispositive matters, the Court reviews de novo objections to the magistrate judge's recommendations. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b); *United States v. Raddatz*, 447 U.S. 667, 673–74 (1980). Under this review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" and "may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1); Fed. R. Cim. P. 59; *United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## BACKGROUND

On January 3, 2025, Rapid City Police Officers Parker Dadah and Kyle Kumjian were traveling in a patrol vehicle in the north sector of Rapid City around 10:00 p.m. Docket 45 at 5. Officer Dadah testified that he is in the patrol division on the Street Crimes Unit. *Id.* at 4. He described that unit as "a group of individuals" that does "any type of proactive policing" with a main "focus on violent crime and drug-related crimes throughout the city." *Id.* He defined "proactive policing" as "the concept of apprehending people prior to crimes happening." *Id.*

While the officers were traveling westbound in the area of Van Buren Street and North Seventh Street, they observed a red Jeep pass them going eastbound. *Id.* at 5. They did not observe the driver of the Jeep commit a traffic offense. *Id.* at 17. Yet, they decided to follow the Jeep down an alley near the intersection of North Seventh and Van Buren. *Id.* at 5–6. When asked to state

the purpose for following the Jeep, Officer Dadah replied that he could not "say there was a definitive purpose for following him." *Id.* at 19.

After following the Jeep in the alley for approximately 30 to 45 seconds, *Id.* at 19, the officers observed the driver park the Jeep in what Officer Dadah described as "almost a private parking lot off the alley[,]" *Id.* at 6. Officer Dadah wanted to speak to the driver, so he parked the patrol vehicle, but he did not block in the Jeep or turn on the patrol vehicle's lights or sirens. *Id.* at 6, 19. When asked if it is "part of the Street Crimes policy to do what [he was] doing here, follow vehicles, get out when they get out, and ask them if they have licenses[,]" Officer Dadah replied, "I would say this is less something that Street Crimes specifically does. This is something I personally have done multiple times, yes, sir." *Id.* at 23.

Officer Dadah exited the patrol vehicle and observed the driver exit the Jeep. *Id.* at 8. Officer Dadah testified that he identified himself as law enforcement and asked the driver if he had a driver's license. *Id.* The audio from Officer Dadah's body camera footage reveals the following exchange:

> **Driver**: Huh?
>
> **Officer Dadah**: You have a valid license?
>
> **Driver**: Ahh, I don't, not on me right now.
>
> **Officer Dadah**: Ah ok, cool, what's your name, man?
>
> **Driver**: What'd I do wrong?
>
> **Officer Dadah**: Well, you are driving without a license.
>
> **Driver**: How do you know?

**Officer Dadah**: You just told me.

**Driver**: I just said that I don't have it on me right now.

**Officer Dadah**: Well, also South Dakota law says that you need to have immediate access to your driver's license.

Exhibit 1 at 00:38–00:57. At the suppression hearing, Officer Dadah testified that he believed he had probable cause to stop the driver based on him stating he did not have a driver's license on him. Docket 45 at 8.

The body camera footage shows, after the above exchange, the driver reaching into his pants pocket, retrieving a cell phone, and looking at the phone. Exhibit 1 at 00:57–0:59. Officer Dadah asked the driver again for his name, but the driver did not answer. *Id.* at 01:04–01:07. At this same time, Officer Kumjian can be seen walking toward the passenger side of the Jeep. *Id.* at 01:07–01:09. The driver again reaches into his pants pocket, this time locking the doors to the Jeep. *Id.* at 01:10. Officer Dadah testified that this made him suspicious because based on his "experience, people trying to get distance from an object is odd[,] [e]specially when an officer approaches a car" and "they just immediately lock it[.]" Docket 45 at 9.

Officer Dadah told the driver to keep his hands out of his pockets, and the driver complied. Exhibit 1 at 01:12. Thereafter, the driver put his cell phone to his ear and can be heard saying, "Hey mom." *Id.* at 01:10–01:15. The driver turned his body while talking on the phone, and a couple seconds later, Officer Kumjian signaled to Officer Dadah by tapping his wrists together that the driver should be handcuffed. *Id.* at 01:15–01:17. Officer Dadah testified

that Officer Kumjian told him later that he had "observed loose ammunition around the vehicle" and believed the driver could have a firearm on him. Docket 45 at 10.

Officer Dadah placed the driver in handcuffs, and the driver said, "What the fuck did I do?" Exhibit 1 at 01:20. The driver told his mother on the cell phone that he was being handcuffed. *Id.* at 01:23. Officer Kumjian told the driver he was not under arrest. *Id.* 01:24. He asked the driver if he had a gun on him or in the car. *Id.* at 01:30–01:31. The driver replied, "I don't know who I was with but . . . I am not a felon or anything, but I don't know." *Id.* at 01:32–01:40.

Officer Dadah asked the driver for his name, saying, "Let's start there." *Id.* at 01:42. The driver said, "My name is Diego. I have a warrant out." *Id.* at 01:48–01:51. Officer Dadah asked for his last name, and Diego replied, "Belone." *Id.* at 01:54–01:57. Officer Dadah told Belone that they were going to walk him to the patrol vehicle. *Id.* at 01:59. While they were doing so, Belone heard his mother say his name through the cell phone, and he turned toward the sound of her voice. *Id.* at 02:06. Officer Dadah grabbed Belone's arm, and Belone said, "Let me talk to my - - what are you doing?" *Id.* at 02:06–02:09. Officer Dadah replied, "You need to listen to me right now. . . . You are under arrest. You are in my custody. You don't call the shots." *Id.* at 02:10–02:17.

Officer Kumjian placed Belone in the passenger seat of the patrol vehicle. *Id.* at 02:20. Officer Dadah, using Belone's cell phone, told Belone's mother that Belone was under arrest and would be at the county jail in about an hour.

*Id.* at 02:22–02:29. She said that she will come get her vehicle, and Officer Dadah replied, "Your vehicle's getting towed." *Id.* at 02:26–02:30.

While in the patrol vehicle, Officer Dadah used a computer to confirm that Belone had an active arrest warrant. Docket 45 at 11. Thereafter, Officer Dadah conducted a vehicle inventory. *Id.* at 13; *see also* Exhibit 1 at 04:26–20:41. He testified that there is a policy within the Rapid City Police Department that a vehicle be inventoried before it is towed to protect the department and the company that tows the vehicle. Docket 45 at 12. He first used a flashlight to look through the windows of the Jeep and observed "a Ziploc baggie of sorts" on the driver's side floorboard area that contained "a green substance" he believed to be marijuana. *Id.* at 13. Officer Dadah decided at that point that he had probable cause to search the vehicle. *Id.* During the search, Officer Dadah and Officer Kumjian found a black firearm under the driver's seat and some clear baggies with white reside in the center console area that later tested presumptively positive for cocaine. *Id.* at 14.

After Belone was taken to the Pennington County Jail, Officer Dadah spoke with him. *Id.* at 15; Exhibit 2. Officer Dadah discussed the items found in the Jeep and told Belone this was a "cut and dry distribution case." Exhibit 2 at 03:15–04:10. He told Belone that he would like to give him the "opportunity to tell him what is going on tonight." *Id.* at 04:40. When Belone began to describe the events of that evening, Officer Dadah stopped him. *Id.* at 04:55. Officer Dadah told him he would listen to him, but he explained that

because they are in the jail, he has "to read this to [him]." *Id.* at 04:55–05:13.

Officer Dadah held a card in front of him and read Belone the following:

> You the continuing right to remain and stop questioning at any time. Anything you say can be used as evidence against you. You have [indecipherable] presence of an attorney. If you cannot afford an attorney, an attorney will be appointed for you. Do you understand these rights?

*Id.* at 05:14–05:31.[1] Belone looked down and mumbled, "Yeah," quietly. *Id.* at 05:32. Thereafter, Officer Dadah asked Belone if he wanted to waive his rights to talk to him. *Id.* at 05:34. Belone shrugged his shoulders while nodding his head left to right and said, "I guess, about whatever." *Id.* at 05:39. The following exchanged occurred:

> **Officer Dadah**: Here's the deal man, you can answer all of my questions, none of my questions. It's just a yes or no.
>
> **Belone**: Okay, like a yes or no about what?
>
> **Officer Dadah**: If you wish to talk to me tonight, man.
>
> **Belone**: Umm, [indecipherable] yeah.

*Id.* at 05:39–05:55.

Officer Dadah then asked Belone about the gun and drugs he found in the Jeep. *Id.* at 05:55–06:02. Belone said that he smokes weed a little bit now and then, but he does not sell it. *Id.* at 06:02–06:20. He said the baggies in the car are all old, but he uses them to "gum" the cocaine. *Id.* at 06:23–06:32, 08:50–08:52.

---

[1] Officer Dadah read the words on the card rapidly. The Court listened to the recording at 50% speed in an attempt to decipher the words read to Belone.

Officer Dadah asked about the gun, and Belone said that the gun was not his, that his friend left his gun in the car. *Id.* at 07:53–07:58. He claimed that he does "not know what the case is with the gun" and that he does not like to be around guns. *Id.* at 07:58–08:03. He was not willing to provide the name of the owner of the gun because he did not want to get him involved. *Id.* at 08:07–08:16.

After the above encounter led to his indictment for possession of a firearm by a prohibited person, Docket 1, Belone filed a motion to suppress, Docket 24. He alleged that the search of his person and the Jeep violated his right against unreasonable searches and seizures. Docket 25 at 1. He also claimed that he was illegally arrested and that his statements "were made while illegally in custody and without required warnings in violation of his rights not to give evidence against himself, and . . . his right against unreasonable search and seizure." *Id.*

The government opposed his motion, asserting that the officers had probable cause to believe Belone violated the law when he said he did not have a driver's license. Docket 32 at 5. The government then claimed that the evidence was lawfully obtained from the vehicle pursuant to the inventory and plain view exceptions. *Id.* at 6. The government also asserted that Belone's statements at the police station should not be suppressed because Officer Dadah read Belone his *Miranda* rights and confirmed Belone's understanding of them before Belone told Officer Dadah about his drug use and handling of the firearm in question. *Id.*

The magistrate judge held a hearing on the motion to suppress on July 9, 2025. Docket 37. The government presented testimony by Officer Dadah and entered into evidence the footage from Officer Dadah's body camera. Docket 40 at 1. The magistrate judge considered the evidence at the hearing and the parties' written briefs and issued a Report and Recommendation, recommending that Belone's motion to suppress be granted in part and denied in part. *Id.* The magistrate judge recommended denying the motion to suppress the evidence obtained from Belone's Jeep because probable cause existed to conduct a warrantless arrest of Belone after he admitted to not having a driver's license on his person, and the officers conducted a valid inventory search of the Jeep. *Id.* at 10–12. However, the magistrate judge found Officer Dadah's *Miranda* warnings constitutionally inadequate and recommended granting Belone's motion to suppress the statements he made at the Rapid City Police Department, with the qualification that the statements would be admissible for impeachment purposes in the event Belone testifies at trial. *Id.* at 20, 22.

## DISCUSSION

### I. Belone's Factual Objections

"When a defendant objects to the factual findings of a magistrate judge, the district judge must make its own *de novo* determination of the facts with no deference to the magistrate judge's findings." *United States v. Running*, 698 F. Supp. 2d 1186, 1189 (D.S.D. 2009). In doing so, "the district judge must make an independent review of the record, including tapes of evidence and the

9

transcript of evidentiary hearings before the magistrate judge." *Id.* Belone

advances multiple objections to the magistrate judge's findings of fact, and

each objection is addressed in turn.

Belone takes issue with the magistrate judge's finding that "Officers

Dadah and Kumjiun [sic] 'began to follow the Jeep' after observing it." Docket

48 at 2. According to Belone, Officer Dadah testified that he made a U-turn to

get behind the Jeep. *Id.* This objection is overruled. While the magistrate

judge's finding does not refer to the officers making a U-turn, the finding

accurately reflects Officer Dadah's testimony that they began to follow the Jeep

after seeing it. In any event, the fact the officers made a U-turn is not

necessary to the Court's legal analysis.

Belone objects to the magistrate judge's finding that Officer Dadah

"introduced himself as a police officer[.]" *Id.* at 2. According to Belone, the

officer's "introduction is more fairly characterized as nearly

incomprehensible[.]" *Id.* He claims that he "clearly has no idea what has

brought the police upon him." *Id.* at 3. Officer Dadah testified that he identified

himself as law enforcement after he exited the patrol vehicle, and this type of

introduction can be heard on Exhibit 1. Also, Belone did not enter evidence

into the record as to his personal thoughts and feeling about the encounter.

Therefore, this objection is overruled.

Belone objects to the accuracy of the magistrate judge's transcription of a

portion of Exhibit 1, namely that Officer Dadah said, "oh, okay, what is your

name, man?" *Id.* According to Belone, the statement should be: "Ah ok, cool,

what's your name, man?" *Id.* The government agrees that the statement was not accurately transcribed. Docket 53 at 3. Therefore, the Court sustains this objection, and the Report and Recommendation is modified to clarify that Officer Dadah said, "Ah ok, cool, what's your name, man?"

Belone requests that the Report and Recommendation include a finding that "Belone did not respond and refused further communication with Dadah until the officers handcuffed him" after Officer Dadah said, "Ah ok, cool, what's your name, man?" Docket 48 at 3. While Belone did not respond and instead turned to talk to his mother on his cell phone, the Court's review of Exhibit 1 does not support that he *refused* communication until he was handcuffed. Therefore, this objection is overruled.

Belone also requests that the Report and Recommendation include a finding that Officer Dadah "placed himself in front of Belone, who had cars behind him and that Kumjiun [sic] moved behind and to his left to peer into Belone's car." *Id.* This objection is overruled because the magistrate judge's findings of fact adequately convey the scene of the stop, and the facts requested by Belone are not necessary to the Court's legal analysis.

Belone objects to the magistrate judge omitting a finding that "Belone could not see Kumjiun [sic] signal Dadah for his handcuffing[.]" *Id.* According to Belone, because he could not see Officer Kumjian's signal, he was startled by Officer Dadah seizing him. *Id.* Belone did not testify; therefore, the record does not contain evidence on what he did or did not see or what he felt. This objection is overruled.

11

Belone objects to the magistrate judge's "omission that Belone is in fact no longer free to leave as he is handcuffed when [Officer] Dadah asks, 'What's your name man? Let's start there.'" *Id.* He further objects to the magistrate judge not including a finding that "[Officer] Dadah's statement implies that a new stage of interrogation has begun and that Belone was never free to choose silence." *Id.* The magistrate judge did not include a finding that Belone was no longer free to leave after Officer Dadah said, "What's your name man? Let's start there" or the implications of Officer Dadah's statement. However, Belone's objection is in essence directed at legal determinations regarding whether Belone was under arrest, and Belone's counsel's characterization of the import of the officer's statement is not evidence. Therefore, his objection is overruled.

Belone takes issue with the magistrate judge's characterization of Officer Dadah's reaction to Belone's attempt to respond to his mother as Officer Dadah walked him to the patrol vehicle. *Id.* at 4. Belone contends that the officer's "tone of voice is fairly characterized as authoritative when he tells Belone that he is under arrest and that he does not call the shots." *Id.* The magistrate judge's finding does not refer to Officer Dadah's tone of voice or necessarily characterize the officer's reaction. Rather, the magistrate judge found that "Officer Dadah grabbed Mr. Belone's arm and told Mr. Belone he was under arrest, in Officer Dadah's custody, and that Mr. Belone does not call the shots." Docket 40 at 5. This finding is consistent with the Court's independent review of Exhibit 1. Therefore, this objection is overruled.

Belone objects to the magistrate judge not including a finding "that the officers did not try to confirm that there was a warrant for Belone's arrest" and a further finding that "without confirming his license status and without confirming the warrant, [Officer] Dadah pronounced him under arrest." Docket 48 at 4. This objection is overruled. The fact the officers did not, prior to placing Belone in the patrol vehicle, confirm or try to confirm his license status or whether an active warrant existed is necessarily subsumed in the magistrate judge's findings of fact detailing the circumstances of the encounter in the alley on January 3, 2025.

## II.    Belone's Legal Objections

Belone contends that his encounter with the officers was not consensual from the outset in light of the officers making a U-turn, following him into an alley, asking him if he has a valid driver's license, and stepping closer to him when he chose not to answer. *Id.* at 6–9. He further asserts that the officers did not have reasonable suspicion to detain him, noting that Officer Dadah made it clear that when he approached Belone that he did not have a reason to suspect Belone had violated the law. *Id.* at 9–10. Belone also argues that the magistrate judge incorrectly concluded that a violation of SDCL § 32-12-39 gave the officers probable cause to arrest him. *Id.* at 4–5. He notes that a violation of SDCL § 32-12-39 is a petty offense, and under SDCL § 23A-3-2, a law enforcement officer cannot arrest someone without a warrant for a violation of a petty offense. *Id.* at 5. Belone acknowledges that he told the officers that he

13

had a warrant, but he emphasizes that he did not make that statement until after he was handcuffed and not free to leave. *Id.* at 11.

In response, the government contends that the officers' initial encounter with Belone was consensual, noting the magistrate judge's findings that the officers did not park the patrol vehicle so as to block in Belone's Jeep, did not impede Belone's freedom of movement, left their weapons holstered, Officer Dadah introduced himself as a police officer, and there was no indication that Belone was the focus of a particular investigation. Docket 53 at 8. However, the government seems to concede that a violation of SDCL § 32-12-39 would not by itself give an officer probable cause to arrest a person without a warrant. Docket 53 at 6. Nevertheless, the government argues that the magistrate judge properly concluded that probable cause existed for Belone's arrest based on the following: Officer Dadah lawfully detained Belone after Belone said he did not have a driver's license on his person; during this detention, Belone said he had a warrant out; and thereafter, Officer Dadah confirmed that Belone had an active arrest warrant. *Id.* at 7.

### a. Consensual Encounter

"Not all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment." *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001). A consensual encounter is one of them. *Id.* "The determination whether an encounter is consensual depends upon the unique factual nature of each case." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007). "So long as a reasonable person would feel free 'to

14

disregard the police and go about his business,' the encounter is consensual and implicates no Fourth Amendment interest." *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). "[C]ircumstances indicative of a seizure may include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* (quoting *United States v. Angell,* 11 F.3d 806, 809 (8th Cir. 1993)). Importantly, "[e]ven when officers have no basis for suspecting a particular individual, they may generally ask the individual questions and request to examine his or her identification." *United States v. Lopez-Mendoza*, 601 F.3d 861, 865 (8th Cir. 2010) (citation omitted).

Applying the above standard here, the Court concludes that the officers' initial encounter with Belone was consensual. Although the officers followed Belone's Jeep into the alley without observing him commit any traffic offense, Officer Dadah parked the patrol vehicle in a way that did not block in the Jeep. Belone exited the Jeep on his own, not because the officers ordered him to. As Officer Dadah exited the patrol vehicle and walked toward Belone, Officer Dadah identified himself as a police officer and asked Belone if he had a driver's license. When doing so, Officer Dadah did not display a weapon or physically restrict Belone's movement. He also did not, based on the Court's review of Exhibit 1, lead Belone to believe he was the subject of a criminal investigation. While Officer Dadah did not advise Belone of his right to not

answer his question and walk away, that does not by itself make the encounter nonconsensual absent evidence of coercion or restricted freedom. *See United States v. Dennis*, 933 F.2d 671, 673 (8th Cir. 1991) (noting that "the officers' failure to inform [the defendant] that he was free to leave did not make the encounter coercive"); *United States v. Carpenter*, 462 F.3d 981, 985 (8th Cir. 2006) (considering that the officer asked, not ordered, that the defendant produce a driver's license and registration). Therefore, Belone's objection in this regard is overruled.

### b. Reasonable Suspicion

During the consensual encounter, Belone responded, "Huh?" to Officer Dadah's initial question. Exhibit 1 at 00:43. However, he thereafter voluntarily responded more specifically that he did not have his license on his person when Officer Dadah said, "Do you have a valid license?" *Id.* at 00:44–00:57. South Dakota law requires a licensee to "have a driver license in the licensee's immediate possession at all times when operating a motor vehicle[.]" SDCL § 32-12-39. Because of Belone's potential violation of this statute, what began as a consensual encounter, lawfully elevated to a *Terry* stop based on reasonable, articulable suspicion of criminal activity. *See United States v. Banks*, 553 F.3d 1101, 1104 (8th Cir. 2009) (finding that observing a petty misdemeanor "is more than sufficient to establish reasonable, articulable suspicion of criminal activity"); *United States v. Goodwin-Bey*, 718 Fed. App'x 447, 448 (8th Cir. 2018) (noting that the Eighth Circuit has "upheld findings of reasonable suspicion for violations of misdemeanors and petty misdemeanors

that would not authorize a custodial arrest"). Therefore, the Court concludes that the officers had reasonable suspicion to investigate the status of Belone's driver's license and overrules Belone's objection.

### c. Probable Cause

The magistrate judge determined that a violation of SDCL § 32-12-39 gave the officers probable cause to conduct a warrantless arrest of Belone. Docket 40 at 9–10. However, a violation of SDCL § 32-12-39 is a petty offense, and under SDCL § 23A-3-2, a law enforcement officer may not arrest a person without a warrant for a petty offense. *See State v. Fischer*, 873 N.W.2d 681, 688 (S.D. 2016) ("An officer of the law can arrest a person, without a warrant, for committing or attempting any public offense other than a petty offense in the officer's presence."). Therefore, Belone's objection to this ruling is sustained.

However, that does not resolve the question whether the officers had probable cause to arrest Belone. To answer this question, the Court must first determine whether Belone was under arrest when the officers placed him in handcuffs, as Belone contends, or whether he was simply detained, as the government contends. *See* Docket 48 at 11 (Belone claiming that "[a]ll the indicia of arrest were present" when he was placed in handcuffs, not permitted to talk to his mother, and "effectively told his interrogation was to begin"); Docket 53 at 6–7 (the government claiming that Belone was detained, not arrested, up until Officer Dadah "confirmed Defendant had an active arrest warrant"). The distinction between whether the officers *detained* Belone versus *arrested* him by placing him in handcuffs matters under the Fourth

Amendment because an arrest is valid only if there is probable cause to believe the suspect committed a crime or was about to, "whereas a brief, investigatory detention can be based on only a reasonable suspicion that criminal activity is afoot." *See United States v. Ahrendt*, No. 4:23-CR-40092-KES, 2024 WL 124681, at *8 (D.S.D. Jan. 11, 2024) (citation omitted).

It is well-settled that "[t]he scope of a *Terry* stop is limited, and an investigatory detention 'may turn into an arrest if it lasts for an unreasonably long time or if officers use unreasonable force.'" *United States v. Morgan*, 729 F.3d 1086, 1090 (8th Cir. 2013) (quoting *United States v. Donnelly,* 475 F.3d 946, 953 (8th Cir. 2007)). At what point an investigatory detention turns into an arrest "can be hazy." *Chestnut v. Wallace*, 947 F.3d 1085, 1088 (8th Cir. 2020). However, the Eighth Circuit has made clear that "[o]fficers must use 'the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop.'" *United States v. Newell,* 596 F.3d 876, 879 (8th Cir. 2010) (quoting *United States v. Navarrete–Barron,* 192 F.3d 786, 790 (8th Cir. 1999)). Importantly, "as part of a lawful *Terry* stop, officers may take any measures that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *Id.* at 879 (quoting *United States v. Hensley,* 469 U.S. 221, 235 (1985)).

Here, the government does not argue that placing Belone in handcuffs was reasonably necessary to achieve the purpose of the investigatory detention or reasonably necessary to protect the officers' personal safety. Regardless,

18

because there are facts in evidence that Officer Kumjian signaled for Officer Dadah to handcuff Belone and that the reason for doing so was the belief that Belone could have a firearm on his person, Docket 45 at 10, the Court thus assumes officer safety was the reason Belone was placed in handcuffs.

The question remains, however, whether that use of force—handcuffs—was the least intrusive means necessary to protect officer safety. *See United States v. Aquino*, 674 F.3d 918, 925–26 (8th Cir. 2012) (noting that the failure to use a less serious intrusion may exceed the scope of a *Terry* stop). The Eighth Circuit has recognized that "[t]here are situations where concern for an officer's safety may justify by-passing a pat down during an investigatory detention." *Id.* at 926 (citing a case where an officer was alone in a high-crime area investigating a reliable tip that the suspect had a gun on his person). "However, the use of handcuffs is greater than a de minimus intrusion and thus requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (alteration in original) (quoting *Lundstrom v. Romero,* 616 F.3d 1108, 1122 (10th Cir. 2010)).

The government does not respond to Belone's argument that Officer Kumjian's observation of ammunition in Belone's Jeep did not warrant the use of handcuffs. *See* Docket 48 at 10. Even so, the Court concludes that the facts available to the officers would not warrant a person of reasonable caution to believe that handcuffing Belone was appropriate. While the officers' initial

encounter with Belone occurred at night in a higher-crime area of Rapid City, the officers did not arrive at the scene because of a report of criminal activity or of a possible armed or dangerous person in the area. *See, e.g.*, *Adams v. Williams,* 407 U.S. 143, 144–48 (1972) (concluding that the officer acted reasonably when he reached into the suspect's open car window and removed a loaded weapon from the suspect's waistband without first conducting a pat down because the officer "was alone early in the morning on car patrol duty in a high-crime area" and investigating a reliable tip that a suspect "was carrying narcotics and had a gun at his waist"); *United States v. Halverson-Weese*, 30 F.4th 760, 764 (8th Cir. 2022) (upholding officer's decision to handcuff defendant based on information from a safety bulletin indicating the suspect travels armed with a handgun); *Navarrete–Barron,* 192 F.3d at 789–91 (concluding that officers did not exceed limits of *Terry* stop by drawing weapons and handcuffing drug trafficking suspect who may have been armed).

Further, the officers did not observe Belone engage in criminal activity prior to approaching him, and Officer Dadah did not testify that Belone's behavior suggested officer safety was a concern. Moreover, the Court's review of Exhibit 1 reveals that Belone did not attempt to walk away from the officers, act erratically, or otherwise engage in disruptive or threatening behavior. *See, e.g.*, *Garcia v. City of New Hope*, 984 F.3d 655, 668 (8th Cir. 2021) (upholding use of handcuffs because the suspect "refused to comply with Officer Baker's multiple demands for license and insurance, refused to get out of his vehicle despite being asked by Officer Baker, and was verbally combative from the

beginning of the stop"); *Waters v. Madson*, 921 F.3d 725, 738 (8th Cir. 2019) (upholding the use of handcuffs in light of the defendant's "argumentative, evasive, and uncooperative behavior").

The Court acknowledges that Belone did not give Officer Dadah his name. However, the encounter at the scene was not rapidly evolving, and Belone was not acting furtive or exhibiting behavior that would give the officers reason to believe their safety was threatened by an accessible weapon. *See Aquino*, 674 F.3d at 926–27 (concluding that the intrusion exceeded the scope of *Terry* because it "was not a rapidly evolving situation where Aquino made a furtive gesture which may have given Lutter reason to believe his safety was threatened by a readily accessible weapon"). The Court also considers Officer Dadah's testimony that it was suspicious to him that Belone put his hand in his pocket and locked the Jeep as Officer Kumjian was walking toward the Jeep. Docket 45 at 21. But Officer Dadah's testimony reveals that the behavior did not give him a particular concern, let alone a concern for officer safety. Rather, according to Officer Dadah, he could not "say there was a specific thing [he] was suspecting happened[.]" *Id.* Regardless, it is particularly telling for the Court that Belone immediately complied when Officer Dadah told him to take his hand out of his pocket.

Finally, although Officer Kumjian personally acquired information that suggested to him that Belone could have a firearm on his person, the observation of ammunition in Belone's locked vehicle does not, without more, provide an objectively reasonable basis for handcuffing Belone for officer safety.

21

*See El-Ghazzawy*, 636 F.3d at 459 ("*Terry* does not permit such intrusive measures in the absence of any objective safety concerns."). "As the Supreme Court observed in *Terry* and reaffirmed in *Dickerson,* a patdown is ordinarily an effective procedure for detecting a weapon even when the person being frisked is reasonably suspected of being armed and dangerous." *United States v. Casado,* 303 F.3d 440, 448–49 (2d Cir. 2002) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 376 (1993) ("The very premise of *Terry,* after all, is that officers will be able to detect the presence of weapons through the sense of touch . . . .")).

The Court is mindful that officers are required to make quick decisions with limited information and that they risk injury and death to themselves; therefore, courts must refrain from unrealistic second-guessing. *See United States v. Sharpe,* 470 U.S. 675, 686–87 (1985). However, the record does not evince that the use of handcuffs to detain Belone was "reasonably necessary to protect [the officers'] personal safety[.]" *See Newell*, 596 F.3d at 879 (citation omitted); *see also Aquino*, 674 F.3d at 926 (finding "no valid reason is apparent on this record which justified Lutter's act of immediately searching underneath Aquino's clothing instead of first conducting a pat down to determine whether the concealed bulge was a weapon"); *El-Ghazzawy*, 636 F.3d at 457–58 (concluding that the circumstances, including that the suspect was not acting erratically and the alleged offense was non-dangerous offense, did not establish an objective safety concern). Therefore, the officers' use of handcuffs to detain Belone transformed the investigatory *Terry* stop into an arrest. *See United*

22

*States v. Sandford*, 813 F.3d 708, 712–13 (8th Cir. 2016) ("A de facto arrest occurs when the officer's conduct is more intrusive than necessary for a *Terry* investigative stop.").

"[A] *Terry* stop that becomes an arrest must be supported by probable cause." *Aquino*, 674 F.3d at 924. The Court does not find that probable cause existed when Officer Dadah placed Belone in handcuffs. Nor does the government claim that probable cause was present at such time. *See* Docket 53 at 7 (claiming that Belone "was lawfully arrested based upon probable cause arising from the arrest warrant"). As such, the Court sustains Belone's objection and concludes the officers violated his Fourth Amendment right to be free from unreasonable searches and seizures by placing him under arrest without probable cause.[2]

"While the Fourth Amendment itself may not provide a constitutional remedy for violations of its commands, evidence obtained through an illegal search and seizure is generally inadmissible against the accused in a criminal prosecution." *United States v. Guerue*, 647 F. Supp. 3d 744, 754 (D.S.D. 2022); *see United States v. Calandra*, 414 U.S. 338, 354 (1974) ("In the usual context of a criminal trial, the defendant is entitled to the suppression of, not only the

---

[2] The government did not argue to the magistrate judge and does not argue to this Court that an alternative basis for admission of the evidence applies (e.g., that the independent-source or inevitable-discovery doctrines apply). In deciding not to address an issue not raised by the government, the Court notes that the government objected to the magistrate judge purportedly addressing an argument not raised by Belone. *See* Docket 50 at 9–11. In any event, "the district court is not obligated to search the record for" issues not raised by counsel. *See United States v. Marts*, 986 F.2d 1216, 1219 (8th Cir. 1993).

evidence obtained through an unlawful search and seizure, but also any derivative use of that evidence."). Here, the evidence obtained includes Belone's statements made after being placed in handcuffs at the scene, his statements made at the police station, and the evidence obtained from the search of his vehicle that was done incident to an unlawful arrest. Because this evidence was obtained through an unlawful arrest, it must be suppressed. In light of this determination, it is unnecessary to address the government's objection to the magistrate judge's decision recommending suppression of Belone's statements made at the police station.

Accordingly, it is hereby

ORDERED that Belone's objections to the Report and Recommendation, Docket 48, are overruled in part and sustained in part. It is further

ORDERED that the government's objection to the Report and Recommendation, Docket 50, is denied as moot. It is further

ORDERED that the Report and Recommendation, Docket 40, is adopted in part and denied in part. It is further

ORDERED that Belone's motion to suppress, Docket 24, is granted.

Dated December 4, 2025.

BY THE COURT:

/s/ Camela C. Theeler
CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE